# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 1998-CA-01217-COA

**MIC LIFE INSURANCE COMPANY AND GENERAL MOTORS ACCEPTANCE CORPORATION** APPELLANTS

**v.**

**BETTYE HICKS, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE ESTATE OF DAVID E. HICKS, DECEASED** APPELLEE

| | |
|---|---|
| DATE OF TRIAL COURT JUDGMENT: | 06/19/1998 |
| TRIAL JUDGE: | BILLY JOE LANDRUM |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | R. WEB HEIDELBERG, JESS H. DICKINSON, KATHARINE MALLEY SAMSON, JAMES G. THORNTON |
| | ANDREW L. FREY |
| ATTORNEYS FOR APPELLEE: | JOHN M. DEAKLE, JOHN M. SIMS, |
| | WILLIAM R. COUCH, PAUL B. CASTON |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| TRIAL COURT DISPOSITION: | DIRECTED VERDICT FOR ACTUAL DAMAGES OF $637.99. JURY VERDICT OF $6 MILLION IN PUNITIVE DAMAGES AGAINST MIC LIFE AND $30 MILLION IN PUNITIVE DAMAGES AGAINST GMAC; REMITTED TO $1 MILLION AND $5 MILLION RESPECTIVELY |
| DISPOSITION: | REVERSED AND REMANDED-06/23/2000 |
| MOTION FOR REHEARING FILED: | 7/7/2000; denied 8/22/2000 |
| CERTIORARI FILED: | 9/19/2000; granted 12/21/2000 |
| MANDATE ISSUED: | |

BEFORE SOUTHWICK, P.J., LEE, AND MOORE, JJ.

SOUTHWICK, P.J., FOR THE COURT:

¶1. The plaintiff's husband, David Hicks, financed the purchase of a pickup truck with General Motors Acceptance Corporation (GMAC). At that time, Mr. Hicks also purchased a credit life policy from MIC Life Insurance Co. The insurance agreement informed him that any unearned premium would be refunded. The loan was satisfied a year later when the truck was traded for a new one, but no request was ever made for a refund. When GMAC sent Mr. Hicks the canceled note, it gave him a form notice that, if there was credit life insurance, he should contact the insurance company to determine if he was owed a refund.

¶2. After Mr. Hicks's death three years later, his widow discovered the insurance policy. When MIC Life refused to pay the death benefit but stated that it would refund the $638 premium, she brought suit against both MIC Life and GMAC. A jury awarded a total of $36 million in punitive damages against both companies, after the trial judge directed a verdict against both of them for the unrefunded premium. We find that a jury issue existed regarding the obligation of the *finance* company (GMAC) for the unrefunded *insurance* premium; we reverse and remand both the actual and punitive damages against GMAC. We also find that trial errors require that the judgment for punitive damages against the insurance company be reversed. The cause is remanded for further proceedings.

## FACTS

¶3. Bettye Hicks's late husband, David Hicks, bought a 1991 Chevrolet pickup truck from Hankins Chevrolet in Taylorsville on April 2, 1991. He financed the purchase through the dealer, Hankins, who immediately after the transaction sold the installment contract to GMAC. Mr. Hicks chose to obtain credit life insurance at the time of the sale, but the purchase was not a requirement to make the loan. The entire amount of the premium, $1,044.48, was transferred by the dealership to GMAC, which then paid a commission to the dealership. The remaining premium was transferred to MIC Life. MIC Life placed the funds in a premium reserve, paying itself from the reserve over the term of the loan as each premium was earned. GMAC does not require that the insurance be purchased from MIC Life or any other affiliated company. An official for the dealer is the agent for issuing the insurance and determines which one of several credit life companies to suggest to a buyer. The borrower is entitled to choose a different insurance company though the practicalities are that it is almost always a company suggested by the dealer.

¶4. GMAC is the sole owner of Motor Insurance Corporation, which in turn owns all of MIC Life Insurance Co. Only the first and last named companies are defendants in this suit.

¶5. A little more than a year after purchasing the 1991 truck, Hicks traded it in on a 1992 truck at another dealership named Chris Posey Chevrolet. The 1991 installment loan was satisfied at that time. Under the insurance contract, when the loan is paid the credit life insurance is no longer effective since it is securing that loan. MIC Life was holding unearned premiums from Hicks's insurance contract of $637.99 to which Mr. Hicks was entitled because of the cancellation of the loan. Under GMAC's standard procedure in Mississippi, in mid-July 1992 GMAC returned the canceled note to Mr. Hicks and also notified the first dealership (Hankins) that the note had been satisfied. A GMAC form notice was sent to Mr. Hicks and stated that "we suggest that you contact the dealer or the insurance company regarding a possible rebate of the creditor life and/or disability insurance premium." The testimony was that neither Hicks nor his wife read this notice, which is called an "OLA notice" in the industry. Instead they placed the unread document in a file.

¶6. After David Hicks's death on February 24, 1995, Mrs. Hicks read the notice as she was examining various papers. She contacted the Hankins dealership at which the policy was obtained, hoping to file a claim. The dealership sent Mrs. Hicks a form for requesting a refund of unearned premiums from MIC Life. Mrs. Hicks informed the dealership that she did not want a refund, but was demanding a death benefit. The dealership sent her a claim form, which she filled out and submitted to MIC Life on March 23, 1995. MIC Life wrote her back on April 10, 1995 and explained that no death benefit was due, but that it would refund the unearned premiums of $637.99. Because of what it termed a "clerical error," MIC Life did not send the refund before suit was filed.

¶7. No inquiry was made with MIC Life when the refund did not arrive. Mrs. Hicks filed this suit on July 5, 1995, against both GMAC and MIC Life. She alleged unjust enrichment, negligence and breach of fiduciary duty against GMAC. Against MIC Life, she claimed breach of contract, breach of fiduciary duty, unjust enrichment, breach of the duty of good faith and fair dealing and negligence.

¶8. At the close of a two day trial, the court entered judgment finding both defendants "jointly and severally liable to the plaintiff for compensatory damages as to all counts" in the complaint. Actual damages in the amount of the unrefunded premium of $637.99 were entered against GMAC and MIC Life, though the premium had been retained by MIC Life. Then the court submitted the issue of punitive damages to the jury. The court allowed the plaintiff's attorney to state in closing argument over defense objection that another jury had awarded punitive damages of $38 million "not long ago" in an unidentified case against an unstated defendant for unknown claims. The jury imposed $30 million in punitive damages against GMAC and $6 million against MIC Life. The court remitted the awards to $5 million and $1 million respectively. GMAC and MIC Life appeal.

## DISCUSSION

### I. Prejudicial Trial Errors

¶9. MIC Life and GMAC cite various trial errors that they argue necessitate at least a remand.

#### A. Evidence concerning GMAC's procedures in other states.

¶10. There was testimony that eight states have adopted statutes that require lenders such as GMAC automatically to refund unearned premiums when an installment loan is prematurely paid off. Over repeated objections, Mrs. Hicks's counsel referred to these eight statutes at trial as the standard by which MIC Life's conduct in Mississippi should be judged. In closing, Mrs. Hicks's counsel argued: "There's no reason they couldn't do that in Mississippi. The only reason they wouldn't do that in Mississippi is because they want to keep the money. They want to keep the people's money. They don't ever intend to pay it back."

¶11. We have attempted to review the statutes in question. They were not introduced into evidence and only one is cited in the briefs. The principal trial evidence was a reference to a GMAC manual that informed its dealers that in eight states it was necessary for the creditor (i.e., GMAC) to refund unearned premiums on credit life policies. It would then be up to the creditor to receive a credit or refund from the insurance company. In those eight states, GMAC imposed that obligation on the dealers from whom it purchased installment contracts. The one statute cited in Mrs. Hicks's brief makes that requirement. Kan. Stat. Ann. § 16a-4-108. This Kansas statutory provision is derived from the Uniform Consumer Credit Code. No state has adopted the UCCC in over twenty-five years. 7A Unif. Laws. Ann., *Consumer Credit Code* (1997). We have not researched whether each of the nine adopted UCCC section 4-108 as did Kansas. The eight states mentioned by Mrs. Hicks's counsel were Alabama, Colorado, Idaho, Kansas, Massachusetts, New York, Oklahoma and Wyoming. Perhaps some of the states adopted a similar provision without accepting the Code.

¶12. As will be discussed more fully below, the alleged relevance for this evidence was to show that the defendants were aware that requiring the borrower/insured to request a refund was not as effective as the system in these other states. If so, it was quite indirect evidence. The statutes in other states create the duty that plaintiff wishes to impose on MIC Life and GMAC in Mississippi, but here there is no statute. A

foreign state's statutory duty does not create a duty in a state without the statute. It may have some other relevance, but the jury must not be misled as to its importance.

¶13. There was also an effort to use the statutes to indicate that a useful alternative approach existed. A possible relevance for the statutes could arise from this reasoning: some states have passed statutes requiring lenders or dealers to reimburse unearned premiums on credit life policies; the refund of premiums in those states is more effective than the OLA notice system; GMAC and MIC Life knew of that disparity; there were methods by which the companies voluntarily could have applied the direct reimbursement approach in Mississippi. There may be other theories that indicate the potential relevance of what a statute requires in a different state.

¶14. The problem for Mrs. Hicks is that the existence of the statutes is itself of little probative value on the claims that she is making. The existence of the statutes sheds no relevant light on the reason that another state adopted it since it does not reveal the degree, or even existence, of problems that the remedy was intended to address. It does not prove that the OLA notice system is meaningfully less effective or that the parties were aware of that. Moreover, the plaintiff's use of the evidence went well beyond proof of notice.

¶15. We hold that this evidence should not have been admitted at the original trial because it was far more likely to mislead than to assist. We are reversing and remanding. If at a new trial Mrs. Hicks again wants to use evidence of these statutes, and in light of other evidence that may support the claim, the court can decide whether the probative value of the evidence outweighs its prejudicial effect. M.R.E. 403.

### B. Improper lay testimony drawing legal conclusions

¶16. Over GMAC's objections, the trial court allowed GMAC employee Mildred Wilbanks to be questioned concerning interpretation of the contract between Mr. Hicks and MIC Life, a separate company. She also was required to state whether she believed the OLA notice procedure violated a specific Mississippi statute, Miss. Code Ann. § 83-53-17. She thus drew legal conclusions in front of the jury. Because Wilbanks is not a lawyer and was not qualified to make legal conclusions, this line of questioning was improper.

¶17. The statute requires a *credit life insurer* to "pay or cause to be paid to the debtor any refund due pursuant to this subsection within thirty (30) days of the accrual of such refund." Miss. Code Ann. § 83-53-17(2) (Rev. 1999). "Accrual" is undefined in the statute, but fulfillment of the obligation requires as a matter of common sense that the credit life company know of the right to the refund. Otherwise the company has no reason to refund. How the credit life company is to learn is a central issue.

¶18. We start with noting that the payoff of the loan was to GMAC, who was the lender. The credit life insurance was issued by MIC Life. In some fashion notice had to be received by the insurance company of the fact of the cancellation of the loan. In this case there was a corporate relationship between lender and insurer, but that is not a legal necessity. Nothing within the refund statute requires that the lender be the one that notifies the insurance company. The statutes in the eight other states avoid the notice issue by requiring a direct refund by the lender. This state has not done that. It was Mr. Hicks's insurance. GMAC reminded him with the form notice that, if credit life insurance had been purchased, a refund needed to be requested from the insurance company.

¶19. We hold, and it appears that the dissent agrees, that a lender such as GMAC simply could not be

liable for an unrefunded premium under a Mississippi statute requiring that an insurance company make the refund unless there was sufficient evidence to make a jury question of the existence of some conspiracy involving both companies. The witness should not have been required to give her own legal analysis.

¶20. Though a somewhat different matter, we address here the dissent's view that the statutory obligation that is on credit life companies to refund within thirty days required that MIC Life have in place better procedures to cause that to happen. The majority and dissent disagree on whether the procedures as a matter of law had to be something other than what occurred here. Since MIC Life has not appealed the order that it repay the unearned premium, this difference of legal opinion affects MIC Life's liability for punitive damages and not for actual damages, and does not affect GMAC.

¶21. The punitive damage issue we are returning for further proceedings. What could be made a separate issue on remand is an obligation on MIC Life that does not depend on proof of a conspiracy with GMAC. It would be a free-standing failure by MIC Life to comply with the statute regardless of GMAC's complicity. Of course, GMAC factually could have been involved as well. If all Mrs. Hicks wishes to prove is that GMAC should have notified MIC Life of the payoff of the loan, that is swept into the conspiracy theory. If there is some alternative theory of how MIC Life failed to have adequate procedures in a manner sufficient for punitive damages, that would be something for the trial court to address if raised.

### C. Judge's comments on the credibility of a witness

¶22. The defendant companies argue that the trial judge improperly communicated his disdain for their case and his disbelief of MIC Life employee Michael Bush's testimony by his comments in front of the jury. The supreme court has stated that a trial judge "should not in any way inadvertently communicate to the jury his opinion regarding the value or credibility of the testimony being offered." *Wirtz v. Switzer*, 586 So. 2d 775, 783 (Miss. 1991).

¶23. At one stage Bush was asked about MIC Life's data systems in eight other states whose refund procedures were set by those state's statutes. Bush stated that he was not qualified to describe those systems in other states. Plaintiff's counsel expressed incredulity that the witness would not know the refund systems there, which was a quasi-question that elicited an objection. MIC Life's attorney stated that the witness was not a Rule 30(b)(6) company representative for deposition purposes, but just a witness with limits on his knowledge. The trial judge responded that Bush "can answer the questions for the corporation, he is required to do so without equivocation."

¶24. Later plaintiff's counsel asked Bush what in essence was a rhetorical question or more to the point, was preliminary jury argument. Yet the court treated it as a basis for another discussion of equivocation. The MIC Life witness was asked whether GMAC loaned money "as a favor."

A. I can't speak for GMAC.

Q. GMAC --

THE COURT: Now just a minute. This is the same situation I got into a while ago. Now, Mr. Bush, I don't want to do this in front of the jury. But if you keep equivocating in front of this jury -- I can't keep sending the jury out. I am going to make the statement to you at this time, just answer out what you know. And I don't think that the jury or anybody else is going to believe that you don't know what you just said. Please be candid about it.

MIC LIFE COUNSEL: Your Honor, for the record, may I say that --

THE COURT: Say anything you want to say, but I want to get on with this trial. You people need to tell your witness how to testify.

ANOTHER MIC COUNSEL: I understand, your Honor, but he is an employee of MIC and his questions about GMAC --

THE COURT: You don't think that this man here is an employee of a major corporation in this country and these people loaning them money, and he says he doesn't know whether they get anything as a result of it? What do you call interest? Now answer up and let's go on.

¶25. MIC Life and GMAC were separate companies. Though they certainly were related, they had different employees with different functions. There was no evidence that the separate corporate structure was a sham. MIC Life employee Bush's right to limit his responses to questions regarding his company and not about GMAC should have been protected.

¶26. The characterization of Bush's responses as "equivocation" was incorrect and prejudicial. *Nichols v. Munn*, 565 So. 2d 1132, 1133-34 (Miss. 1990).

### D. Prejudicial statements by Mrs. Hicks's counsel

¶27. During closing arguments and rebuttal, there are several instances of excessive jury argument. To have upheld objections to these arguments as not being based on evidence, as instead trying to prejudice the jury against the defendants based on speculation and stereotypes about big out-of-state corporations, would likely have been proper rulings. Such rulings are for the trial court's reasonable discretion, conscious of the inferences that can be drawn from the evidence that is introduced.

¶28. There are frequent legal descriptions about the wide latitude for jury argument. *Ball v. Sloan*, 569 So. 2d 1177, 1179 (Miss. 1990). Such generalities cannot override fundamental fairness of trials, the need for evidence to support argument, and the need to exclude unfairly prejudicial comments. We do not find it necessary to sift the evidence on the specific point of the acceptable inferences of heartlessness and arrogance that the plaintiffs sought to create in the jurors' minds. If there is a new trial, the trial court must balance the competing interests in both a full and a fair closing argument.

¶29. In this closing argument, however, is another example of the effect of the trial court's admitting evidence about what other states require. Mrs. Hicks's counsel stated that GMAC had been "called on the carpet" by the eight states in which they are required by statute automatically to refund unearned premiums upon payoff of the loan. This statement construed evidence of what GMAC was required to do in a few other states as indicators of fault in Mississippi. By itself it was not. Absent evidence of the effect of such a system versus the effect of the approach used as to the Hicks loan, or the reasons why the other states adopted the statutes, the existence of the statutes cannot support the argument that was made.

¶30. Finally, Mrs. Hicks's counsel told the jury about a $38 million verdict "up here not long ago," but gave no details. Details would not have made the statement relevant. There was no evidence offered prior to closing argument about punitive damages in other suits, and even if there had been it should have been excluded. The only possible use for such information was to suggest a standard against which the jury could

measure its own zeal. The jury returned a verdict of $36 million, which all but proves the prejudice. That the trial court later granted a remittitur does not fully correct the distorting of the entire deliberative process by the judge's error.

¶31. Mrs. Hicks states that MIC Life's counsel did not object to any of these comments by her counsel, although she admits that GMAC did object and was overruled. Therefore, she asserts, MIC Life cannot argue this issue on appeal. The trial court expressly ruled at the beginning of trial that each defendant would be deemed to have joined in any objection raised by the other. Therefore, the assignment of error is preserved.

¶32. Mrs. Hicks asserts that any harmful effect of the remarks was cured by this jury instruction: "Arguments, statements and remarks of counsel are intended to help you to understand the evidence and apply the law, but are not evidence. Any argument, statement or remark having no basis in the evidence should be disregarded by you." Such an instruction smooths the rough edges of a few overzealous comments, but it does not substitute for the trial judge's role in excluding significant improper comments such as those in this case.

¶33. We find reversal is required for these errors. The dissent argues that the worst of the errors affects GMAC and not MIC Life. We cannot draw the lines quite so finely. This was a trial sufficiently flawed as to draw into question the verdict against both defendants, not only but perhaps most clearly because the central allegation below was that these two companies were in a conspiracy with each other. What damned one alleged conspirator reasonably damned the other in the minds of the jurors.

## II. Directed verdict on compensatory damages

¶34. The trial judge directed a verdict against the defendants, finding each liable for the unpaid insurance premium. Whether that was correct is addressed next since it forms the basis for actual damages that must be found before punitive damages can be awarded.

### A. MIC Life's Liability for premium.

¶35. The insurance company does not seek a new trial regarding the judgment against it for the unpaid premium. Thus we do not discuss the issue.

### B. GMAC's liability for premium

¶36. Analyzing GMAC's possible liability for the unrefunded premium starts with understanding its role in the insurance purchase. GMAC buys the installment loan agreements from the automobile dealers. If the car buyer wanted credit life insurance, the premium is paid at closing. The premium in this case was received by MIC Life, though other insurance companies are used as well. The dealer as agent for the insurance and not GMAC keeps a commission for selling the insurance. When loans are prepaid, GMAC sends notices (the OLA notices) to the prepaying customers, informing them that they may be entitled to a refund of unearned credit life premiums.

¶37. Mrs. Hicks argues that GMAC involved itself in the refund process, thus becoming liable when unearned premiums were not refunded. The notice allegedly created GMAC's liability.

¶38. A debtor-creditor relationship is not a fiduciary one. *Peoples Bank & Trust Co. v. Cermack,* 658

So. 2d 1352, 1358 (Miss. 1995). Upon collecting the money for the premium by financing it with the loan, GMAC paid a commission to the dealership and forwarded the net premium to MIC Life. A fiduciary obligation regarding what occurred thereafter would not normally arise.

¶39. Two cases are cited by Mrs. Hicks to prove that this situation was exceptional. In one, the finance company collected the credit life premium and was to tender the premium to the insurance company but failed to do so. *Parnell v. First Savings & Loan*, 336 So. 2d at 766. In this case, there is no question that the credit life premium was promptly forwarded to MIC Life. In the other precedent, the bank and life insurance company failed to inform the borrower that the credit life insurance on two notes would expire with the maturity of the notes. *Lowery v. Guaranty Bank & Trust Co.*, 592 So. 2d 79, 80 (Miss. 1991) When her husband died, the borrower was told that no insurance benefits were available. *Id.* The supreme court found that, although no formal fiduciary relationship existed between the Lowerys and the bank, their long and personal history of dealings caused the Lowerys to place trust and confidence in the bank "to the point of being less vigilant about the coverage of the credit life insurance than they had been in the past . . . ." This made an issue of material fact as to whether a fiduciary relationship had been fostered by the bank. *Id.* at 85. A jury question also existed of whether "the lender had a duty to define any ambiguous terms or specialized terms which might mislead unknowledgeable customers who rely on the lender for advice." *Id.* at 84. Here the point is the unambiguous OLA notice that the borrower needed to contact the credit life company to get any refund on the credit life insurance. Certainly no advice not to contact the insurance company was ever given.

¶40. Despite Mrs. Hicks's testimony that she and her husband "trusted everybody" and "thought everything was taken care of," there was no history of dealing between the parties that could have led Mrs. Hicks to place this level of reliance and confidence in GMAC without its consent. Further, the trust here was not on whether there would be insurance at all, the subject of both *Lowery* and *Parnell,* but on the refund of a premium when the agreement and a follow-up notice by the lender informed the borrower-insured of the need to send the insurance company a request.

¶41. Mrs. Hicks argues that GMAC was unjustly enriched. Both the injustice and the enrichment must be shown. A corporation and its subsidiaries are separate legal entities and are not liable for each other's actions unless the plaintiff establishes circumstances that justify piercing the corporate veil. *Rauch Indus., Inc. v. Poloron Prods. of Mississippi*, 362 So. 2d 605, 607 (Miss. 1978). The Fifth Circuit applied the same rule of law in a case in which the court reversed a holding that a parent corporation was liable for the wrongs of its subsidiary on a theory of unjust enrichment. *United States v. Dean Van Lines, Inc.*, 531 F.2d 289, 290 (5th Cir. 1976). In *Dean*, the separate corporate identities were upheld absent "such a unity of interest and ownership that the individuality of the subsidiary as a distinct entity has ceased." *Id.* at 291. No such unity of interest between GMAC and MIC Life has been demonstrated here.

¶42. Mrs. Hicks also argues that GMAC was negligent. For that, there must have been a duty and a breach of that duty by GMAC. Mississippi law imposes no duty on a lender to refund unearned credit life premiums upon early termination of an installment contract. A Mississippi statute requires the *insurer* to make a prompt refund, but not the *creditor*. Miss. Code Ann. § 83-53-17 (Rev. 1995). Mrs. Hicks argues that GMAC assumed a duty to see that the premiums were refunded when it "stuck [its] nose in the refund business" by sending out OLA notices and by requiring dealers to promise that they would facilitate refunds upon customer request. The principle that Mrs. Hicks cites for her contention that GMAC assumed responsibility for refund is the duty incurred by one who goes to the rescue of a person in difficulty or peril,

taking "charge or control of the situation." Prosser and Keeton on Torts, 5th Edition § 56 (5th ed. 1984). This rescue rule does not apply.

¶43. GMAC sent a notice to Mr. Hicks to remind him that he would need to seek a refund. Whatever duty GMAC might be said to have assumed, it is limited by the extent of the undertaking. *Stacy v. Aetna Cas. & Sur. Co.*, 484 F.2d 289, 295 (5th Cir. 1973) (finding that an insurance company performing limited safety inspection did not assume employer's duty of inspection and was not liable under Mississippi law to an employee injured in an accident). The practice of reminding customers of their rights cannot be converted into a responsibility to make certain that the rights were exercised.

¶44. Therefore it was reversible error to direct a verdict finding GMAC liable for the unpaid premium. Unless it was liable for actual damages, it could not be liable for punitive damages. *Hopewell v. Trustmark Nat'l Bank,* 680 So. 2d 812, 820 (Miss. 1996). GMAC's liability for actual damages did not arise by contract and is not imposed by the statute which requires insurance companies to refund. If such liability is to be found it is a matter for the jury to resolve based on what is at best circumstantial evidence of a conspiracy. We reverse and remand for consideration of this question at any new trial that is held. In all events GMAC's liability was not a proper subject for a directed verdict.

### III. Liability for Notification System

¶45. We have found that errors in the presenting of argument and evidence require the reversal of the judgment as to both defendants. As a separate matter, we now look at the cause of action itself. Was enough shown to constitute questions for the jury other than for actual damages?

¶46. We note what the evidence supports. GMAC and MIC Life were related companies with separate corporate missions. One was to provide financing for purchase of General Motors automobiles while the other was to provide credit life insurance. Lenders do not issue insurance, though they may act as agents for borrowers for the purchase of insurance. Thus MIC Life needed to be a separate corporate entity from GMAC. The original credit life insurance documents provided that if the loan were paid off early, a refund of the unearned premium would be made. When *this* loan was paid off early, GMAC sent the OLA notice to Mr. Hicks that reminded him of the need to make the request to the insurance company for a refund. Mr. Hicks never did so.

¶47. A reasonable person could conclude that whatever reasons might exist for the requirement that the insured send notice, one effect is that the number of refunds is less than one hundred percent. However, unless the lender itself makes the refund, someone has to notify the insurance company. Among the understandable reasons for the system is to place the obligation on the insured to protect himself, such that a negligent failure by the lender to get the notice to the insurer does not itself create liability. There was no statutory nor contractual obligation for the lender to refund. There was not even an obligation that we have discovered to send the OLA notice. The money was MIC Life's. GMAC's notice was a reminder of the possibility of a refund. Notice from the insured both prompts the insurance company and gives current information on the address to send the payment.

¶48. Mrs. Hicks's contention is that GMAC and MIC Life conspired together to permit MIC Life to retain a percentage of the unearned insurance premiums through their notification system, creating a windfall to MIC Life which also benefitted GMAC as its "grandparent" company. The evidence of a conspiracy to defraud was circumstantial. The "fraud" in essence is that these two companies did not use the system that

most effectively would cause unearned premiums held by MIC Life to be refunded. A majority of this Court finds that suspicions surrounding the employment of the OLA notice system were adequate to make a jury issue of whether this approach was adopted in order to reduce the number of refunds. The majority of the Court also finds that a jury question existed of whether that purpose was a breach of various obligations that the companies had towards Mr. Hicks, including the contractual obligation of good faith and fair dealing.

¶49. Even though a majority concludes that evidence was sufficient to justify submission to the jury of the claim for punitive damages, the consideration of that evidence was warped by the evidentiary and other trial errors. A remand is necessary.

## A. *MIC Life's liability for punitive damages*

¶50. MIC Life concedes that it erred in failing to send Mrs. Hicks her refund after learning of her entitlement in a letter dated March 23, 1995. Suit was filed July 5, 1995, so the delay was about three months. MIC Life early in the litigation paid the unearned premiums to the clerk of court. Different theories for making MIC Life liable for punitive damages are discussed next.

## 1. *Breach of fiduciary relationship*

¶51. The starting point is that the relationship between an insurance company and an insured is in most respects only contractual, not a fiduciary one. The principal fiduciary duty involves the insurer's resolution of claims made on the policy and to defend and compromise claims against the insured made by third parties. *Hartford Accident & Indemnity Co. v. Foster*, 528 So.2d 255, 263-66 (Miss.1988). Mrs. Hicks testified that she and her husband trusted these companies. However, she had no contacts with MIC Life prior to the inquiries after her husband's death. The truck loan for which that policy had been obtained had long previously been satisfied, so no detrimental reliance occurred from the trust. She offered no evidence of a course of dealing between herself and MIC Life that would give rise to a trust relationship. The party seeking to prove the existence of a fiduciary duty must do so by clear and convincing evidence. *People's Bank v. Cermack*, 658 So. 2d at 1358. Mrs. Hicks did not do so.

¶52. In support of her argument that the relationship between MIC Life and the Hickses amounted to a constructive trust, Mrs. Hicks cites *Planter's Bank & Trust Co. v. Sklar*, 555 So. 2d 1024, 1034 (Miss. 1990), a case in which a landlord sought to enforce a landlord's lien on crops. That case in turn relies on several other cases that we will discuss. One of the precedents stated this:

> A constructive trust is one that arises by operation of law against one who, *by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment or questionable means, or who in any way against equity and good conscience*, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy.

*Sojourner v. Sojourner*, 247 Miss. 342, 353, 153 So. 2d 803, 807 (1963)(emphasis added).

¶53. In another precedent, the court defined a constructive trust in the following manner:

> A constructive trust is a means recognized in our law whereunder one who unfairly holds a property interest may be compelled to convey that interest to another to whom it justly belongs.

*Allgood v. Allgood*, 473 So. 2d 416, 421 (Miss. 1985).

¶54. Finally, the court said:

> A constructive trust is a fiction of equity. It is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.

*Russell v. Douglas*, 243 Miss. 497, 505-506, 138 So. 2d 734 (Miss. 1962).

¶55. The common theme running through these definitions of a constructive trust is that the trustee is holding another's money and cannot properly retain it. That argument is what supports the majority's view that each company is potentially liable if the jury finds that they conspired to implement a refund system for the purpose of reducing the number of refunds.

¶56. A different basis for damages is MIC Life's delay in refunding the premium after receiving notice from Mrs. Hicks in 1995, a delay that MIC attributes to "clerical error." If MIC Life through good faith inadvertence delayed refunding the premium after Mrs. Hicks contacted them in 1995, there would be no liability for exemplary damages due to the 1995 delay. That is a jury question.

¶57. Absent proof of bad faith and a conspiracy, MIC Life's obligation was to refund the unearned premium once it had a reason to know that Mr. Hicks was entitled to those funds. If eight states require that the process operate differently, that is not itself a basis for a punitive damages claim in Mississippi. If on the other hand MIC Life in bad faith by itself, or in conspiracy with GMAC, created a system in which the number of reimbursements would be unconscionably reduced, then that is a matter for a jury to consider after a proper trial.

### 2. Breach of duty of good faith and fair dealing

¶58. Inherent in every contract relationship is a duty of good faith and fair dealing. *Merchants & Planters Bank v. Williamson*, 691 So. 2d 398, 404-05 (Miss. 1997). This is a significantly lesser obligation than that owed by a fiduciary. *Id.* at 405. It merely "requires abstinence by all parties from commission of wrongful conduct which injures the 'right of [another] to receive the benefits of the agreement.'" *Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172, 1188 (Miss. 1990).

¶59. In order for MIC Life to have breached its duty of good faith and fair dealing, there would have to be evidence that it interfered in some way with the insured's ability to receive their refund. There is circumstantial evidence that the plaintiff alleges proves a bad faith conspiracy. The evidence of course is that if *GMAC* had paid the refund, at least on insurance issued by one of its affiliated companies, the insured's receipt would have been definite. No Uniform Consumer Credit Code nor similar provision requires that in Mississippi. Providing instead that the insured must contact the insurance company when the lender is paid early is not onerous, impractical, nor barred by statute. Certainly the Mississippi Legislature could consider whether such a prohibition should be created.

¶60. To prohibit this arrangement generally, we would have to find that this refund system violates public policy. We do not find here, especially in light of the statute placing the premium refund obligation for credit life insurance on the insurer, that informing the borrower in writing that it should request a refund is on its

face unconscionable, unfair, or otherwise to be prohibited. If the specific evidence in this case would permit a finding that GMAC and MIC Life had a bad faith purpose in employing the refund system, then that should be resolved by a new trial. We remand for a new trial so that the jury can decide if the facts support the conclusion of bad faith here.

### 3. Unjust enrichment

¶61. Unjust enrichment is a cause of action only in quasi or implied-in-law contracts, not when there is an express contract between the parties. *Ellis v. Anderson Tully Co.*, 727 So. 2d 716, 719 (Miss. 1998). Because there was an express contract for insurance between MIC Life and the Hickses, no recovery for any unjust enrichment claim was proper.

### 4. Breach of contract

¶62. We have already discussed the basis of the contract claim. There was a fact question as to whether MIC Life breached this contract by its failure to refund the premium either in 1992 or when Mrs. Hicks notified the company in 1995 of her claim. MIC Life cites authority that mere "clerical error or honest mistake" will not support a punitive award. *Consolidated Amer. Life Ins. Co. v. Toche*, 410 So. 2d 1303, 1306 (Miss. 1982). The factual basis for this separate potential liability for MIC Life can again be considered at a new trial.

### 5. Negligence

¶63. Whether or not MIC Life was guilty of negligence is a question of fact. Absent proof of misconduct sufficient to justify punitive damages, all that Mrs. Hicks would receive if negligence were proven is actual damages.

### IV. Judgment for Defendants As a Matter of Law

¶64. One issue remains, namely, whether the suit was timely brought.

¶65. Before trial, MIC Life and GMAC moved for summary judgment, stating that the cause of action was barred by the statute of limitations. The court denied the motions, stating that the question of when the statute began to run on these claims was "more of a jury issue than it is a legal issue." However, this issue never made it to the jury because the court later directed a verdict against both defendants on all counts.

¶66. The following dates are relevant to the statute of limitations:

*April 2, 1991* -- Mr. Hicks signed the retail installment contract to purchase the 1991 truck, opting to purchase credit life insurance. The contract contained notice that a refund might be available if the loan was prepaid.

*June 29, 1992* -- Mr. Hicks terminated the installment contract by trading in the 1991 truck and purchasing a 1992 truck, paying off the loan.

*July 14 or 15, 1992* -- GMAC sent the Hickses and the original dealer an OLA notice, together with a notice of payoff of the 1991 truck.

*February 24, 1995* -- Mr. Hicks died.

*March 23, 1995* -- Mrs. Hicks sent MIC Life notice of life insurance claim.

*April 10, 1995* -- MIC Life notified Mrs. Hicks by letter that she was not entitled to a death benefit because the contract terminated on June 29, 1992, but that she was due a refund of the unearned premiums. MIC Life then failed to refund the premiums.

*July 5, 1995* -- Mrs. Hicks filed suit against MIC Life and GMAC.

¶67. The appropriate period of limitations arises from the general three year statute. Miss. Code Ann. § 15-1-49 (Rev. 1995). The supreme court has held that a cause of action accrues "only when it comes into existence as an enforceable claim; that is, when the right to sue becomes vested." *Gentry v. Wallace*, 606 So. 2d 1117, 1121 (Miss. 1992). A cause of action for breach of a life insurance contract accrues on the date of the breach, for example, on the date that the insurance company refused to pay, and not on the date of the decedent's death. *Young v. Southern Farm Bureau Life Ins. Co.*, 592 So. 2d 103, 107 (Miss. 1991).

¶68. Mrs. Hicks argued that MIC Life was under an obligation to return the unearned portion of the premium automatically, without any request from the customer. If this is true, the obligation arose on June 29, 1992, when the loan was satisfied. The suit was filed on July 5, 1995, three years and six days later. However, regardless of when the duty came into existence, the breach of the duty would have occurred on that same date only if MIC Life was required to refund immediately. Instead, a reasonable period of time to comply with the duty would exist before a breach would have occurred.

¶69. More importantly, we have determined that absent proof of a conspiracy, MIC Life did not have a duty to refund without notice being sent. Instead of a reasonable time period measured from the date that the loan was satisfied with GMAC, MIC Life had an obligation to pay only from the date that it received notice from the insured. In other words, Mr. Hicks would not have had a legitimate cause of action against MIC Life on June 29, 1992, as MIC Life had not yet failed to uphold its obligations.

¶70. The legitimate period of time to send the refund is set by a previously discussed statute. A credit life insurer is required to "pay or cause to be paid to the debtor any refund due pursuant to this subsection within thirty (30) days of the accrual of such refund." Miss. Code Ann. § 83-53-17(2) (Rev. 1999). The accrual of the right to a refund is judged by the parties' agreement as to when the entitlement commences. Again, MIC Life's deadline for repaying arose thirty days after the notice was sent by Mrs. Hicks.

¶71. There is no statute of limitations problem in the claim. Even if there were, there is also a potentially relevant statute extending the limitation period when a claimant dies before the statute of limitations has run. Miss. Code Ann. § 15-1-55 (Rev. 1995).

¶72. **THE JUDGMENT OF THE CIRCUIT COURT OF JONES COUNTY AS TO PUNITIVE DAMAGES IS REVERSED AND THE CAUSE IS REMANDED. THE JUDGMENT AWARDING COMPENSATORY DAMAGES IS AFFIRMED AS TO MIC LIFE AND IS REVERSED AND REMANDED AS TO GMAC. COSTS ARE ASSESSED ONE-THIRD TO EACH PARTY.**

**McMILLIN, C.J., BRIDGES, MOORE, AND THOMAS, JJ., CONCUR.**

**IRVING, J., CONCURRING IN PART AND DISSENTING PART BY SEPARATE**

**WRITTEN OPINION, JOINED BY KING, P.J., LEE AND PAYNE, JJ.**

IRVING, J., CONCURRING IN PART, DISSENTING IN PART:

¶73. MIC Life Insurance Company (MIC Life) and General Motors Acceptance Corporation (GMAC) appeal from a Jones County Circuit Court judgment against MIC Life in the amount of $1 million in punitive damages, and against GMAC in the amount of $637.99 in actual damages and $6 million in punitive damages. Judgment for $637.99 in actual damages also was rendered against MIC Life. However, MIC Life does not appeal the judgment of actual damages. The judgment was entered against each defendant after the trial judge had reduced the jury's verdict against MIC Life by $5 million and against GMAC by $24 million. The majority reverses and remands the judgment against both MIC Life and GMAC. It reverses the actual damage award against GMAC because it finds a jury issue exists as to GMAC's obligation to refund the unearned premium. It reverses and remands the punitive damage award against both MIC Life and GMAC because of what it finds to be prejudicial errors committed by the trial judge. I agree with the majority that the judgment against GMAC must be reversed and remanded. However, I believe the judgment against MIC Life should be affirmed. Accordingly, I respectfully dissent from that portion of the majority opinion reversing the judgment against MIC Life.

¶74. Hicks's complaint against MIC Life alleged breach of fiduciary duty, breach of contract, unjust enrichment, breach of duty of good faith and fair dealing, and negligence. She sought both compensatory and punitive damages. She also alleged that because MIC Life required the entire premium to be paid in advance before it was earned, MIC Life had a fiduciary duty to her. She alleged that MIC Life breached that fiduciary duty by "failing to pay the claim for death benefits or, in the alternative, to refund the unearned premium" and by "failing to investigate to inform itself that the underlying note to GMAC had been paid." The complaint further alleged that MIC Life's actions were performed with the intent to retain the unearned premiums or with gross disregard for the rights of [Hicks] . . . , thus warranting the imposition of punitive damages."

¶75. Hicks's complaint against GMAC alleged that MIC Life was a wholly-owned subsidiary of GMAC and received benefits from MIC Life by receiving a return on shareholder investments based on the earnings generated by MIC Life. It alleged that GMAC was unjustly enriched by receiving dividends from its wholly-owned subsidiary, MIC Life, which dividends were paid partly from premiums which were unearned. The complaint further alleged that as the lender and parent corporation of MIC Life, GMAC owed a duty to Hicks to exercise reasonable care to inform MIC Life when the loan was paid in full, so MIC Life could refund the unearned premium. The complaint also alleged that GMAC's actions were performed with the intent to allow MIC Life to retain unearned premiums, or with conscious indifference to Hicks's rights.

¶76. Hicks's complaint did not allege an outright conspiracy between MIC Life and GMAC to increase the probability of MIC Life's retention of the unearned premium belonging to Hicks. However, it is clear from the record that the conspiracy theory was the bedrock of Hicks's action against GMAC, that the parties so understood it to be and that the case was tried accordingly. This is made clear by the following jury instruction to which neither MIC Life nor GMAC interposed an objection:

The Court instructs the jury that if you find from clear and convincing evidence that the defendants, GMAC and/or MIC Life, willfully and deliberately entered into a plan with reference to refunds of unearned premiums which was contrived to circumvent the laws of the State of Mississippi and the Certificate of Insurance by requiring an additional burden on the customer in order to receive a refund

of unearned premium which burden was not required by state law or the insurance contract;

And, if you further find that the motive of GMAC and/or MIC Life in designing and utilizing said plan was to increase the profits of either GMAC or its wholly-owned subsidiary, MIC Life, then you may, in your discretion, assess punitive damages as against both GMAC and MIC Life, or either of them.

¶77. I find it necessary to recite some facts which I believe are relevant to the undergirding of MIC Life's liability, both as to actual damages and punitive damages.

### I. MIC Life's liability

¶78. On April 2, 1991, David E. Hicks entered into an installment sales contract to purchase a pickup from Hankins Chevrolet Company. He also purchased credit life insurance from MIC Life to cover the truck loan. The purchase price of the truck, as well as the total premium for the credit life insurance, was financed through GMAC, the corporate grandparent of MIC Life. On June 29, 1992, David traded the truck for a newer model, and the original loan from GMAC was paid off, thus effecting a premature termination of the insurance coverage.

¶79. The certificate of credit life and disability insurance (insurance contract) provided, "*In the event of termination of this insurance prior to the maturity date, the unearned portion of the insurance charge will be refunded to you or credited toward your indebtedness."* (emphasis added). The insurance contract contained no requirement that the insured notify MIC Life in case of termination of the insurance prior to the maturity date in order to receive the refund although it did contain a provision that MIC Life be notified in case of a loss. State law requires that the unearned portion of credit life insurance premiums be refunded within thirty (30) days of the date of accrual of such refund. Miss. Code Ann. § 83-53-17 (1972).

¶80. It is undisputed that MIC Life did not refund the unearned portion of the premium in a timely manner nor in accordance with the requirement of Miss. Code Ann. § 83-53-17 (2) which provides in pertinent part:

Each individual policy or group certificate shall provide that in the event of termination of the insurance prior to the scheduled maturity date of the indebtedness, any refund of an amount paid by the debtor for insurance shall be paid or credited promptly by the insurer to the person entitled therefor; . . . *The insurer shall pay or cause to be paid to the debtor any refund due pursuant to this subsection within thirty (30) days of the accrual of such refund.* (emphasis added).

¶81. The quoted statute imposes a duty on the insurer to refund unearned premiums within thirty (30) days of the accrual of such refund. The duty is not contingent upon the insurer being notified by the insured. The majority interprets the statute to mean something other than the express terms of the statute. While the statute requires the refund to be made within thirty (30) days of the accrual of such refund, the majority construes that to mean within thirty (30) days of being notified by the insured or the insured's representative. I find this an unwarranted intrusion into the legislative branch of government. It seems to me that if the legislature intended the refund to be made within thirty (30) days of being notified by the insured instead of thirty (30) days of the accrual of the refund it would have simply written the statute to say as much. Clearly, the legislature knows the difference between "accrual" and "notification." There is perhaps a good reason why the legislature would choose the date of accrual as the operative date instead of the date of notification.

With credit life insurance the insured pays the premium in advance; it seems entirely reasonable to me that the legislature would not want the insurance company to retain citizens' premiums, and thereby make a profit, for any unreasonable period of time beyond the expiration of the covered risk.

¶82. Faced with a statutory duty to refund unearned premiums within thirty (30) days, it was incumbent upon MIC Life to have controls in place to guarantee compliance with its statutory duty. When the loan in this case was paid off in June 1992, MIC Life had an obligation to refund the unearned premium thirty (30) days later. MIC Life attempts to explain away any liability for its failure to comply with the statute by asserting clerical error. In arguing clerical error, it addresses its failure to refund the premium in the context of the period of time following Mrs. Hicks's notification to MIC Life of Mr. Hicks's death. I believe MIC Life is being much too kind to itself in limiting the relevant period to that time between March and October, the former date being the date of notice of Hicks's death and the latter being the date of the refund. As discussed, MIC Life had a duty to make the refund within thirty (30) days after the payoff of the note.

¶83. Even if the relevant period was the more limited one, it is entirely reasonable for the jury to conclude that MIC Life's failure to make the refund until October 1995, represented a gross indifference to Hicks's rights. The loan was paid off April 29, 1992. The refund was made in October 1995. It is of no moment that MIC Life did not learn about the payoff until March 1995. MIC Life's failure cannot be excused on the basis of lack of knowledge. The failure to obtain timely notice only serves to highlight both MIC Life's failure to comply with its statutory duty and the injustice which is bound to occur as a result of MIC Life not having the proper notification controls in place. It cannot pass the buck.

¶84. The jury was entitled to consider the totality of MIC Life's actions and inactions and draw its own conclusion. It seems reasonable that punitive damages were properly awarded against MIC Life for the reasons discussed.

¶85. MIC Life also contends that despite its failure to comply with the statute, the three year statute of limitations should bar Hicks's claim since she filed her lawsuit three years and six days after the loan had been paid off. In so arguing, MIC Life blurs the period of time for statute of limitations purposes with the period of time imposed upon it by statute to make refunds.

¶86. MIC Life contends that if it had an obligation to refund the unearned premium within thirty (30) days from the payoff of the note, the statute of limitations bars Hicks's suit because the note was paid off on June 29, 1992, and Hicks did not file her lawsuit until July 5, 1995. The majority appears to agree that, if MIC Life had an obligation to pay without being notified by the insured or his representative, the statute of limitation had indeed run. What both the majority and MIC Life fail to recognize is that the statute gives MIC Life thirty (30) days to refund. Hicks would not have a cause of action until MIC Life failed or refused to make the refund. Since the legislature has given insurance companies thirty (30) to pay, no cause of action accrues to the insured until the thirty-first day. In other words, a statutory presumption of the refusal to pay arises on the thirty-first day. Hicks's cause of action did not accrue until July 30, 1992, and since she filed her lawsuit on July 5, 1995, it was not time barred. Had Hicks filed a claim for a refund during the initial thirty-day period and been refused, an argument could be made that the statute of limitations began to run on the date of the refusal assuming the refusal was not based on its right to the full thirty (30) days. That is not our case.

¶87. The majority holds that the statute of limitations had not run on Hicks's lawsuit but arrives at that conclusion by finding that MIC Life's obligation to refund the premium did not arise until MIC Life was

notified of the payoff. In explaining its rationale for this conclusion the majority says, "'[a]ccrual' is undefined in the statute, but fulfillment of the obligation requires as a matter of common sense that the credit life company know of the right to refund . . . . How the credit life company is to learn is a central issue." Majority opinion at 7. It may be a central issue but that is a problem for credit life companies doing business in Mississippi which requires the refund to be paid within thirty (30) days of the accrual of the refund. Can it be legitimately argued that the right to the refund does not accrue when the note is paid off prematurely? Moreover, the majority seems to suggest that notification from the insured is the only way credit life insurance companies may receive notice of a payoff. As the evidence reflects in this case, in circumstances when the refund is not being returned to the insured, the credit life insurance company gets notice without being notified by the insured. The notice comes from the lender.

### 2. *GMAC's liability*

¶88. The certificate of insurance listed GMAC as the creditor beneficiary. In case of death of the insured, GMAC would contact MIC Life directly so that it could be paid the balance of the contract price from the insurance proceeds. Likewise, when the unearned portion of a premium was coming to GMAC as a result of repossession of a vehicle that had credit life covering the loan, GMAC, according to its corporate representative, Mildred Wilbanks, did not go through the OLA procedure. That is the procedure whereby GMAC sends a notice to the dealership and the purchaser advising that the purchaser may be entitled to a refund because of early pay-off and that the purchaser should contact the dealership or the insurance company. Understandably, in repossession cases, since GMAC was entitled to apply the unearned premium to the debtor's outstanding balance, GMAC had controls in place to make sure MIC Life refunded the premium directly to GMAC.

¶89. As stated, Hicks sought recovery against GMAC on several bases, including negligence, breach of fiduciary duty and, though not specifically pled but tried, conspiracy to circumvent MIC Life's statutory and contractual obligation to Hicks to provide a timely refund of the unearned premium. Hicks concedes that GMAC's liability hinges upon GMAC's involvement in the premium refund process and any conspiratorial actions with MIC Life to make the refund process more burdensome than required by state law and MIC Life's contractual obligations to Hicks. Otherwise, GMAC would not be liable because of the well established principle of tort law that one person owes no duty t o another to protect him from harm. Hicks further argues that, though GMAC may not have had a duty to protect her, once GMAC voluntarily involved itself, it then had a duty to act reasonably to prevent the harm. Hicks contends GMAC's actions failed the reasonableness test which renders GMAC liable. Further, Hicks contends that GMAC's actions may have amounted to gross negligence since it was aware of the facts and circumstances which led eight states to change their laws to require the lender to refund unearned premiums for credit life insurance. What is the basis for Hick's contention that GMAC was involved?

¶90. GMAC requires all of its dealerships to sign the following letter of agreement:

CREDITOR LIFE AND DISABILITY/MECHANICAL SERVICE - DEALERSHIP LETTER OF AGREEMENT

BRANCH LETTERHEAD

Dealership Name and Address

Creditor life and disability insurance purchased through a carrier is eligible for financing as long as you agree that on prepayment of an account, the unearned insurance charge will be refunded to the customer. *This is accomplished either by our notifying the customer to make application to you for the insurance refund, or by you authorizing us to make the refund.*

Where you authorize us to make the refund, or *in those jurisdictions where certain provisions of the law require lien holder processing of refunds, the unearned insurance premiums will be charged to your account and shown on your monthly Statement of Dealer Credits.*

Mechanical service agreements are eligible for financing as long as you agree that on repossession or total loss of an account, the unearned charges will be debited from your account and credited to the customer.

To evidence your agreement to this arrangement, please have an authorized officer of the dealership sign the original of this letter and return it to us. The second copy is for your records. (emphasis).

¶91. As stated, Hicks argues that had GMAC not become involved in the credit life refunding process, it would have had no liability, but once it became involved, it knew that the OLA notice procedure was inadequate to ensure compliance with state law requiring a refund, within thirty (30) days of unearned premiums. Hicks also argues that because of GMAC's experience in other states, which require the lien holder to refund unearned premiums directly, it knew that a lower percentage of premiums was refunded under the OLA procedure than under the direct refund procedure. Hicks contends that is why GMAC utilizes the OLA procedure.

¶92. Further, Hicks argues that MIC Life and GMAC deliberately and intentionally entered into a plan or scheme designed to circumvent Mississippi law requiring the timely return of unearned premiums. Of course, GMAC argues that all it did was finance the premium and nothing more. It then lays claim to the role of the Good Samaritan by asserting it did not have to do anything to alert the debtor that he may be entitled to a refund of unearned premium, but it did. GMAC then claims outrage that it would be sued for only trying to help. GMAC's contention boils down to this: it is okay for GMAC to finance lump sum premiums for credit life insurance even though it knows, based on experience in other states, the purchasers of that insurance who become eligible for a refund of unearned premiums, may never receive them. Also, GMAC knows that the insurance company, which receives the premiums financed by GMAC, does not have controls in place to ensure either compliance with state law or the provisions of the insurance contract. In other words, it is okay to knowingly participate in a financing scheme with an insurance company that is arguably fraudulent as long as it is the insurance company, not GMAC, which is charged by law with taking the actions necessary to prevent the unlawful retention of customers' money. This is against the backdrop that the financing scheme benefits both GMAC and the insurance company, in this case MIC Life. GMAC is benefitted by the fact that its outstanding loan will be paid in full in case of the untimely death of the insured, and in case of a repossession of the vehicle, it will be able to attach the unearned premium and apply it to the defaulting debtor's account balance. Additionally, if there is a premature payoff of the note, MIC Life would get to keep the unearned premium which would increase its assets, thereby allowing it to pay greater dividends to its investors, one of whom is GMAC, the corporate grandparent of MIC Life. I believe this evidence is sufficient to warrant a finding of a fiduciary relationship in such a situation between GMAC and the purchaser of the insurance, and in this case, between MIC Life, GMAC and Mr. Hicks.

¶93. As stated, I think the evidence is sufficient to warrant a finding that a fiduciary relationship existed

between GMAC and Mr. Hicks. However, I do not believe such a finding would impose a duty upon GMAC to actually make the refund. That duty is imposed by statute upon MIC Life.

¶94. The majority correctly states the law that a finding of actual damage is a prerequisite to a finding of punitive damages. However, it is well-settled law that the actions of one co-conspirator bind other co-conspirators; therefore, any liability flowing from MIC Life's actions and inactions would be binding upon GMAC, making GMAC liable. The actions, however, must be actions taken in furtherance of the conspiracy.

¶95. The trial judge directed a verdict against GMAC for the actual damages stemming from the failure of MIC Life to refund the unearned premium. However, GMAC's liability for the refund hinges not on MIC Life's statutory and contractual obligation to do so but on a finding of a conspiracy on the part of MIC Life and GMAC to circumvent MIC Life's statutory and contractual obligation to do so. Only a jury could make such a finding. Since MIC Life had a statutory and contractual obligation to refund the premium, the directed verdict against it for the premium amount was proper, but the finding of actual damages against MIC Life, an alleged co-conspirator, cannot be imputed to GMAC for purposes of punitive damages since the basis for the award of damages did not emanate from conspiratorial actions.

¶96. As stated, the majority reverses and remands the punitive damage awards against both MIC Life and GMAC because of a combination of what the majority concludes to be prejudicial trial errors. As can readily be seen from the majority opinion, these alleged errors affect, for the most part, GMAC only.

¶97. The first such error concerns the evidence regarding the procedures in other states imposing upon lenders, like GMAC, the duty to make refunds of unearned premiums. Since MIC Life had a statutory duty to do so, it is difficult to discern how admission of this evidence was prejudicial to MIC Life. MIC Life, as the lenders in the other states, also had a statutory duty to refund unearned premiums.

¶98. The next error concerns alleged improper lay testimony drawing legal conclusions. This involved questions put to a GMAC employee regarding her interpretation of the insurance contract between Mr. Hicks and MIC Life and the OLA notice procedure employed by GMAC. Again, this information was elicited in an effort to establish the parameters of scienter on the part of GMAC that would support Hicks's claim against GMAC, not MIC Life.

¶99. The third area of alleged prejudicial trial errors deals with the trial judge's comments on the credibility of the witness. The comments were made in response to a MIC Life witness's statement that he was not qualified to describe the refund procedure systems in those states requiring the lender to make refunds. Again, since MIC Life is required by Mississippi law to refund the premiums, any damage resulting from the judge's comment would affect GMAC, not MIC Life. MIC Life's knowledge or lack thereof of the refund procedures in the other states would have little relevance to its contractual and statutory obligation to refund the premium to Hicks.

¶100. Finally, the majority believes Hicks's counsel's argument to the jury -- "that GMAC had been 'called on the carpet' by eight states in which they are required by statute automatically to refund unearned premiums upon payoff of the loan" -- was so prejudicial that a reversal is warranted. This argument may have been harsh on GMAC, but it escapes logic to conclude the same about MIC Life. My review of the argument by Hicks's counsel leads me to the conclusion that GMAC arguably may have reason to complain but not MIC Life. The majority also finds it prejudicial that Hicks's counsel told the jury about a $38 million

verdict "up here not long ago." The assertion of prejudice to MIC Life emanating from this argument quickly evaporates in light of the jury's verdict of only $6 million against MIC Life which was promptly remitted to $1 million by the trial judge.

¶101. Since the improper questioning, comments and closing argument all related to evidence about GMAC in support of the conspiracy theory between GMAC and MIC Life, and not to evidence in support the separate and distinct claim against MIC Life, I find the errors to be harmless as to MIC Life. If conspiracy had been the only basis for liability against MIC Life, perhaps the majority would have a point.

¶102. The majority also makes much of the fact that MIC Life and GMAC are separate companies. While that is true, it is also true that there was much interaction between them on a daily basis that, in my view, is at least relevant circumstantially on the conspiracy issue. Here is what the record reveals. MIC Life and GMAC were represented by the same attorney from the date the lawsuit was filed on July 5, 1995 until July 11, 1996. On the latter date, another attorney entered his appearance on behalf of MIC Life. The attorney who previously represented both corporate defendants continued to represent GMAC.

¶103. At trial Michael Edward Bush, a MIC Life employee, testified as follows:

Q. And how long have you been an employee of Motors Insurance Corporation?

A. Twenty-four years.

Q. Have you ever worked for anybody else?

A. I worked as a GMAC employee for approximately two years before my MIC career.

Q. As a matter of fact, it's not unusual -- is it -- that GMAC employees and MIC personnel have worked with one company or the other intermittently during their career, is it?

A. No.

Q. No. And the reason for that is, is that GMAC owns the parent company, which is Motors Insurance Company or MIC, don't they?

A. Yes.

Q. Nobody else owns any stock of that insurance company but the parent company who is then owned by GMAC; isn't that correct?

A. That is correct.

Q. And up there in Michigan it's not unusual for y'all all to be pretty close together working every day, isn't it?

A. No.

Q. In the same building?

A. Yes.

Q. Cubicles apart on occasion?

A. They are separate -- may I explain my answer?

Q. You may.

A. Okay. We are separated in different offices within the same building.

Q. But certainly, as this building is, GMAC may be in this office, MIC may be in that office, correct?

A. Yes, that is correct.

Q. And there is no impediment at all -- is there -- for if you have a question as an MIC employee, to go ask or pick up the phone and ask a GMAC employee, is there?

A. No, there's no problem.

Q. No reason whatsoever, is there?

A. No.

¶104. As the above colloquy shows, MIC Life and GMAC have separate corporate identities but it certainly can be inferred circumstantially that there was much interplay between the employees of the two corporations. Therefore, it is not entirely unreasonable to infer that the employees of each corporation probably knew a lot about the operations of the other corporation.

¶105. The majority seems to tacitly accept that the trial errors complained of primarily affect GMAC and not MIC Life but dismisses the lack of prejudice flowing to MIC Life with the following observation:

> The dissent argues that the worse of the errors affect GMAC and not MIC Life. We cannot draw the lines quite so finely. This was a trial sufficiently flawed as to draw into question the verdict against both defendants, not only but perhaps most clearly because the central allegation below was that these two companies were in a conspiracy with each other. What dammed one alleged conspirator reasonably dammed the other in the minds of the jurors. Majority Opinion at 11.

¶106. This observation fails to fully take into consideration that MIC Life had a separate statutory and contractual obligation to refund the unearned premium within thirty (30) days of the payoff of the note on June 29, 1992. It did not refund the premium until October 1995. Even without a finding of a conspiracy between MIC Life and GMAC, the jury could find that MIC Life's failure was actionable for punitive damages. MIC Life admitted actual damages. MIC Life offers nothing to excuse its failure for three years to honor the contract of insurance and abide by its statutory obligation to refund the unearned premium. It attempts to explain its failure to do so, after being notified in March, as a clerical error. The jury was not required to accept this explanation. The jury could reject the explanation on a credibility basis. It also could conclude that notwithstanding the explanation MIC Life ignored a statutory obligation.

¶107. As stated, I see no reason for not affirming the judgment against MIC Life. The majority's suggestion that -- "[w]hat could be made a separate issue on remand is an obligation on MIC Life that does not depend on proof of a conspiracy with GMAC" -- is hardly an olive branch when only a casual reading of the pleadings leaves it unmistakably clear that that is exactly what was before the jury that found MIC Life

liable.

¶108. Finally, I dissent from the majority's limitation of the admissible evidence on remand of the judgment against GMAC. I agree with the majority that evidence that other states require lenders to refund unearned premiums is inadmissible. But evidence of GMAC's and MIC Life's knowledge of the smaller percentage of refunds made under the OLA procedure than under the direct refund procedure is certainly admissible. This is so no matter the source of the knowledge. The jury cannot be told that other states require lenders to refund unearned premiums unless Hicks can also show that the reason for the statutory enactment in the other states was to prevent the low percentage of unearned premiums under the OLA or similar procedure and that GMAC and MIC Life knew that was the reason behind the enactment.

¶109. For the reasons presented, I would affirm the judgment against MIC Life but reverse and remand the judgment against GMAC.

**KING, P.J., LEE AND PAYNE, JJ. JOIN THIS SEPARATE WRITTEN OPINION.**